THE STATE, THE MORRIS AND ESSEX RAILROAD COMPANY ET AL, PROSECUTORS, v. THE HUDSON TUNNEL RAILROAD COMPANY.

1. On an application for the appointment of commissioners to condemn lands, when a petition duly verified is presented to the judge, making a *prima facie* case, with due proof of notice, the appointment should be made as a matter of course. All uncertain and debatable questions should be certified to the Supreme Court.

2. The Supreme Court, on *certiorari* prosecuted by the aggrieved landowner, bringing up the appointment of commissioners, has power to pass upon all questions which affect the right of the company to take the plaintiffs' lands, so far as they will show that as to the plaintiffs no such authority exists.

3. The state granted lands to the plaintiffs with a covenant that, "the state will not make or give any grant, license, power or authority affecting lands under water in front of said lands so granted." *Quere*—Whether the right of eminent domain is not an essential attribute of the state's sovereignty, so paramount, that it cannot be ceded away, so as to preclude the legislature from its exercise in this case? In this case it cannot be assumed that the consent of the plaintiffs to the construction of the tunnel under the river may not be secured.

4. After the tunnel company had filed its certificate under the general railroad law, the legislature passed an act recognizing its due incorporation, and granting it four years to complete its entire work. *Held*, that this enactment healed any errors or informalities which might have existed in the mode of its formation, and gave it power to build the road between the points designated in the certificate filed under the general law, as fully as if those terminal descriptions had been incorporated in the legislative act.

5. The exceptions in the thirty-sixth section of the general railroad law (*Laws*, 1873, *p.* 105,) are designed—*First*. To permit one railroad in all cases to cross the lands of another—and, *Secondly*. To forbid any company organized under the act to take or occupy the lands of another company, which are necessary for the franchises of the latter, for any use except that of a way over, through or under them. The proviso following the exceptions secures a company, after it has located its route, from having its route and franchises appropriated, against its will, by any other corporation under color of this general law.

6. The westerly terminus of the tunnel is defined in the certificate to be on the "western shore of the Hudson river, and within or near Jersey City or Hoboken." The word "shore" is not used in its strictest sense, but in the more extended and popular sense; as that Jersey City is built upon the western shore of the Hudson river.

In error to the Supreme Court.

For the plaintiffs in error, *Vanatta*, Attorney-General.

For the defendant in error, *H. S. White* and *B. Williamson*.

The opinion of the court was delivered by

VAN SYCKEL, J. The Hudson Tunnel Railroad Company is a corporation organized under the general railroad law of this state, passed April 2d, 1873. By its articles of association, the road was to commence "at some convenient and eligible point upon the western shore of the Hudson river, and within or near Jersey City or Hoboken, in the county of Hudson, and State of New Jersey, and thence to run by the most direct and feasible route under the bed of said river, to a convenient and eligible point in that part of the boundary line between the States of New Jersey and New York, lying between said Jersey City or Hoboken, in

said State of New Jersey and the city of New York." It also appears that the company is incorporated under the laws of New York state ; and that the road is to be built in a tunnel from fifteen to thirty-five feet below the surface.

In the prosecution of this enterprise, the company procured a survey of its route to be made, and duly filed in the office of the secretary of state, and presented a petition to a Justice of the Supreme Court for the appointment of commissioners to appraise damages which the plaintiffs in error would sustain by the taking of their lands by this company.

The commissioners were appointed, and a writ of *certiorari* to the Supreme Court allowed for the purpose of determining the questions of law involved in the controversy.

The Supreme Court affirmed the appointment of commissioners, and that judgment is now here for review. In the Supreme Court the relators insisted that the Hudson Tunnel Company had no legal existence as a corporation ; that under the general railroad law a corporation cannot be created with the franchise to build a railroad under an inter-state river ; that by force of the same act, the prosecutors' lands are exempt from sequestration ; and upon these and other grounds the validity of the appointment is now contested. The first question which the case presents is, whether these, and objections of a kindred character, could be considered and passed upon by the Supreme Court ?

In discussing this proposition, it is necessary to ascertain the effect of the appointment of commissioners, while it remains unreversed upon the rights of the adversary landowner.

In *Bennet* v. *Railroad Company*, 2 *Green* 145, which was an application to set aside the report of commissioners assessing damages for lands taken by the railroad, Chief Justice Hornblower held, that informalities or errors committed in the incipient measures, and in the form and manner of appointing commissioners, however fatal, if properly brought before the court, could not be inquired into on that investigation ; and Justice Ford says: "The proceedings of the com-

pany, of the judge and the commissioners have been filed in the county clerk's office, and have there become a record; if they have not been in conformity to the special powers delegated by the statute, they are liable to be reversed in this court upon *certiorari*, and they can be inquired into in no other way. This record, like all others, even of the lowest tribunals in the state, while it stands unreversed, is of such high and incontrovertible validity in law, that nothing can be alleged or heard against it."

By the twelfth section of the general railroad law, the proceedings for condemnation are to be filed in the county clerk's office, and remain of record, and on payment, or tender of payment of the amount awarded, the railroad company is empowered to enter upon and take possession, and a certified copy of the assessment and proof of tender of the amount awarded, shall, at all times, be considered as plenary evidence of the right of the company to hold and occupy the lands, and of the land-owner to recover the amount of the assessment, with interest and costs.

Assuming that the relators have shown such facts as would, if they could be considered, demonstrate that, in truth, the right of the company to condemn their lands does not exist, the result inevitably follows, that there must be some tribunal in which the defence of the land-owner may be maintained and enforced. In determining the forum into which the plaintiffs shall be driven to assert their rights, we must assume, also, in order to affirm the proceedings below, that they have been prosecuted with such regard to validity, both of form and substance, as to become plenary evidence, while unreversed, of the company's right to the lands upon the payment of the certified valuation.

It is manifest that, in an action of trespass or ejectment, or any other collateral proceeding at law by the land-owner, against the company for entering upon his lands, these recorded proceedings of the commissioners would furnish a complete bar to recovery. They would conclude the parties, and prohibit further controversy as to the right to enter upon

and hold possession of the *locus in quo;* no allegation to the contrary would be admissible. If resort is had to equity, would not the estoppel operate there with equal force, and conclusively establish the rights of the parties, the right to possession on the one side, and payment on the other, as the final determination of a competent tribunal?

The proposition is, to deprive a proceeding at law, regularly taken by competent authority, without any fraud or mistake, of the legal effect and conclusive force which the statute expressly declares it shall have, by a collateral proceeding in equity.

The ground suggested upon which a complainant's bill in such a case could be retained is, that his rights are invaded, and he is remediless at law.

When the equitable jurisdiction had attached, the remedy sought for could be granted only by declaring that the complainant's lands were not liable to seizure, and that the inferior jurisdiction, in attempting to subject them to sequestration, had acted without the requisite power. This would involve the doctrine that a special statutory tribunal, upon a *prima facie* case, when its actual want of power would be apparent upon proof of all the facts, can give a judgment which will conclude the adverse party, and be wholly unassailable in a court of law, leaving him only a doubtful remedy by protracted litigation in equity.

It may be that equity can be appealed to, especially where, for complete relief, it is necessary to call into operation the injunction power, but it certainly has not exclusive jurisdiction. The Supreme Court has repeatedly assumed the power to controvert the right of the judge, who makes the appointment, to exercise the special statutory function.

I think the rule is correctly stated in the opinion of the court below that, when a petition duly verified is presented, making a *prima facie* case, with proper proof of notice, the appointment should be made as a matter of course. That course seems clearly to be contemplated by the twelfth section of the general railroad law. The duty prescribed for the

judge is a very narrow one, and the nature of the proceeding is wholly inappropriate to the determination of questions of such magnitude as would constantly be presented. No mode is pointed out, and no power is given to the judge to take testimony to determine disputed facts. In the absence of any express authority, none should be implied, as it would not only lead to great delay in the prosecution of railway enterprises, by the litigation of numberless important issues before the judge, but his finding upon mere facts which could be contested before him, would not be reviewable.

The general railroad law provides that a corporation organized under it, shall not take the lands of any other corporation, except for the purpose of crossing such lands, and except the lands of such other corporations not necessary for the purposes of their franchises.

If the judge, on the application for the appointment of commissioners, may determine what lands are necessary for the purposes of the other company, his decision as to that fact, I apprehend, would be final. In the absence of clear authority to support it, such power should not be found to exist.

All uncertain and debatable questions should be certified to the Supreme Court, which can give adequate redress to suitors in these cases, in virtue of its general supervisory jurisdiction over all inferior jurisdictions proceeding in a summary way; and over all commissioners and officers appointed to execute a trust or power, general or special.

The principal is universal that, wherever the rights of individuals are invaded by the acts of such tribunals, exercising their authority illegally, the persons aggrieved must seek redress by *certiorari*. It appertains to the general supervisory jurisdiction of the Supreme Court, exercising in that behalf the powers of the King's Bench, to correct any abuses flowing from an actual want of power in the inferior.

It was upon this ground that equity refused to interfere in *Tucker* v. *Freeholders of Burlington*, *Saxton's Ch.* 282 ; and in *Le Roy* v. *New York*, 4 *Johns. Ch.* 352. This course of proce-

dure is sanctioned by long usage ; it furnishes an inexpensive and speedy adjudication, and ought not now to be questioned.

It is not subject to the criticism that a *certiorari* has merely the effect of a writ of error, and that, in passing upon the proposed questions, the Supreme Court would have gone outside of its appellate, and assumed original jurisdiction. Under its supervisory powers the Supreme Court can, in all cases, inquire and adjudge on *certiorari*, whether the inferior has exercised its authority illegally ; whether the act it has undertaken to do, can lawfully be done.

In *Vail* v. *The Morris and Essex Railroad*, 1 *Zab.* 189, the Supreme Court determined, upon evidence taken, whether the company had surveyed and located their road over the land included in the award, and filed their survey in the office of the secretary of state ; whether a change of route over the prosecutor's lands had been legally made, and whether due notice had been given to the land-owner.

In *Doughty* v. *The Somerville and Easton Railroad*, 1 *Zab.* 442, which was a *certiorari* to remove into the Supreme Court the appointment of commissioners to assess the value of lands, Justice Randolph considered and passed upon two questions :

*First*—Whether there could be any condemnation until the entire route of the company was surveyed, adopted and filed.

*Second*—Whether the charter of the company was unconstitutional and void.

He declared that this objection, if valid, must prevail.

The extent of this supervisory jurisdiction is illustrated in cases of assessment made by municipal corporations. In *The State, Wilkinson, pros.*, v. *Trenton*, 7 *Vroom* 499, where it appeared affirmatively on the face of the proceedings below, that an essential act had been done, this court assumed that if the asserted fact had been disproved in the Supreme Court, it would have been fatal.

The Supreme Court, in reviewing an order appointing commissioners, in *Coster* v. *New Jersey Railroad*, 3 *Zab.* 227, decided the question whether proceedings could be instituted to condemn the title to lands, long after the company had

located and constructed its road. This case was afterwards affirmed in this court. 4 *Zab.* 730.

In the proceedings to condemn lands, certified into the Supreme Court, in *Childs* v. *The Central Railroad,* 4 *Vroom* 324, the question was involved and decided, whether, when the company had obtained a certain width of way, constructed their road on it, and long used it, they could condemn lands to increase its width.

In this case the commissioners were appointed, a writ of *certiorari* and rule to take affidavits granted, and then the facts being agreed upon, to be used on the argument as if duly proved under the rule to take affidavits, the questions involved were considered and adjudged.

On a *certiorari* bringing up the appointment and award of commissioners in *Morris and Essex Railroad* v. *The Central Railroad,* 2 *Vroom* 205, three questions were passed upon :

*First*—Whether the Central railroad had any legal authority to construct the branch road in question.

*Second*—Whether the power to make new lines of road between Phillipsburg and Elizabethport included or excluded those two places.

*Third*—Whether a right of passage over one railroad could be condemned by the other.

In the more recent case of *State, National Railway Co., pros.,* v. *Easton and Amboy Railroad,* 7 *Vroom* 181, the appointment of commissioners was certified into the Supreme Court, and, upon testimony taken, important questions were there decided. In none of these cases has the propriety of such practice been challenged.

In principle and substance, the questions adjudged in the cases cited do not differ from those pressed for consideration in the case before us.

The substance and pertinency of the objections started relate to the extent of the powers of the Hudson Tunnel Company, under their certificate of organization and the public laws of this state.

Their right to take the lands of the plaintiffs, which is the

foundation upon which the validity of the entire proceeding must rest, being the subject matter which the plaintiffs propose to controvert.

*The State, Jersey City,* v. *Montclair Railway,* 6 *Vroom* 328, is directly in point. There the judge appointed the commissioners on a *prima facie* case, and granted a writ of *certiorari,* and testimony was then taken to establish the facts. The Supreme Court held that under the ordinary powers conferred on the Montclair Railway Company by their charter, they had not the power to condemn the reservoir property of the city water works, for the purpose of building a railroad through it, and therefore the appointment was set aside. Some expressions in the opinion of the court in *Columbia Bridge* v. *Geisse,* 6 *Vroom* 558, seem to indicate a contrary view, but a careful examination of that case will show that it is not in conflict with the authorities referred to. In that case commissioners were appointed by a justice of the peace to assess the damages to a ferry, which Geisse claimed to own, by the erection of a bridge over the river.

In the Supreme Court the point was taken that Geisse had no interest in the ferry, for which damages could be assessed, and evidence was taken to establish that fact. In this court it was held that this evidence could not be considered; that if the proper jurisdictional facts were made to appear, showing a *prima facie* case, the appointment was a matter of course. The opinion of the court does not hold that the fact that the bridge was actually built, and that the ferry existed prior thereto, or that any other matter upon which the right to make the appointment depended, could not be contested in the Supreme Court. But when those facts were made to appear, and Geisse claimed that he had a ferry right, the Supreme Court could not, in that proceeding, pass upon the extent of his right, or even the existence of an actual interest in the ferry in Geisse, because that question would properly be litigated when the assessment was made, and again on trial of an appeal to a jury.

State, Morris and Essex R. R. Co., pros., v. Hudson Tunnel R. R. Co.

The ferry existing, the bridge being subsequently built, and Geisse claiming an interest in the ferry, he was entitled to be heard before the commissioners to establish such right as he might have.    It was a statutory mode of trying his rights, his recovery, as in other cases, being contingent upon his ability to prove a cause of action, and his right to a trial in that forum when the case was brought within its jurisdiction was a matter of course.    That this court did not intend to declare that the Supreme Court could not consider, whether the case was within the operation of the act under which commissioners were appointed, is clear from the fact that the question was here adjudged, whether the right to compensation extended to a ferry created after the bridge was chartered, and before it was erected ?

That was certainly a debatable question, and one which, according to the opinion of the Supreme Court in the case now under review, ought not to have been passed upon by the justice of the peace who appointed the commissioners in the Geisse case.    If the ferry-owner had resisted an application by the bridge company to condemn his ferry franchise under a legislative act for that purpose, the question, whether the ferry was within the operation of the act, would have been equally a subject matter for review in the Supreme Court.

My conclusion on this branch of the case is, that the Supreme Court had the right, in a suit instituted by the party aggrieved, to dispose of the questions, which were discussed, upon their merits, so far as they affect the right of the tunnel company to take the plaintiffs' lands.    With this limitation the whole case is here for adjudication.

The plaintiffs do not seek to dissolve the Hudson Tunnel Company, or to have its organization adjudged a nullity; this court has no power, in this proceeding, to that end.    The plaintiffs ask no affirmative relief, they are purely on the defensive, resisting the claim of the defendant to appropriate their lands for its uses, and now ask this court to say whether there is any authority to do so.

All matters upon which such authority rests are necessarily involved in the discussion.

The first objection to the legality of these proceedings is founded on a grant and lease of lands made by the state to the prosecutors, in which the state covenants with them, that " the state will not make or give any grant or license, power or authority affecting lands under water in front of said lands so granted."

The application now is, not to take the lands under water in front of the lands so granted, but for a right of passage over lands adjoining to, and westerly of the lands under water. The contention is, that the tunnel enterprise will be wholly nugatory, by reason of the fact that this contract with the state imposes an impassable barrier to the power of the Hudson Tunnel Company, without the assent of the prosecutors, to acquire the right to pass under the water in front of their lands, and, therefore, the present application will be practically without any useful results, and should be denied.

It is not necessary to consider whether the right of eminent domain is not an essential attribute of the state's sovereignty, so paramount that it cannot be ceded away, so as to preclude the legislature, in any case, from its exercise. It is difficult to perceive how the exercise of the power of eminent domain in this case would violate the obligation of the contract, any more than where there is an express agreement by the state for quiet enjoyment by its grantee, which has not been supposed to interfere with the right of eminent domain. In that event, the grantee would not suffer loss, for the exclusiveness of the grant, and the agreement against interference with it, if valid, would constitute elements in its value to be computed in assessing to him compensation for its condemnation.

A sufficient answer to the objection is, that at this juncture it is manifest, that it cannot be assumed that the tunnel company may not secure the assent of the plaintiffs to the construction of the their tunnel under the river—it cannot be said to be impossible to do so. With such consent the state's contract interposes no obstacle to securing the right of way.

The next reason relied upon is, that the Hudson Tunnel Company did not so make its certificate of organization as to authorize it to condemn lands.

The first section of the general railroad law (*Laws*, 1873, *p.* 88,) provides that persons wishing to organize railroad corporations under that act, " may make and sign articles of association, in which shall be stated, among other things, the places from and to which the road is to be constructed." In this certificate the places from and to which the railroad is to be built and operated are as follows: " The same is to commence at some convenient and eligible point upon the western shore of the Hudson river, and within or near Jersey City or Hoboken, in the county of Hudson, and thence to run by the most direct and feasible route, under the bed of the river, to a convenient and eligible point in that part of the boundary line between the States of New York and New Jersey lying between said Jersey City or Hoboken, in said State of New Jersey, and New York city."

The case, as presented, does not require an interpretation of the first section of the general railroad law. By an act of the legislature of this state, passed March 21st, 1874, after the certificate of the Hudson Tunnel Company was filed, it was enacted " that ' The Hudson Tunnel Company,' a corporation duly incorporated under the laws of the State of New Jersey, is hereby allowed two years from the passage of this act in which to complete its first mile of tunnel ; provided, that it shall complete its entire tunnel and railroad within four years from the passage of this act."

Without intending to hold that the naming of a company claiming the right to exercise corporate powers, in a subsequent legislative enactment, would be such a recognition of it by the law-making power as would establish a corporate existence, otherwise imperfect, I think this act is so broad and ample in its scope that it leaves nothing to implication or construction. It not only expressly recognizes the company as duly incorporated, but confers, in terms, the franchise to construct the proposed work between the points designated.

in the certificate, as fully as if those terminal descriptions were incorporated in the legislative act.

What road did the legislature give the company power to build?

Obviously, the only one that could have been intended was that described in the certificate of their organization, which had been previously filed. It is conceded that the words describing the termini, if contained in a special charter, are sufficiently definite. If any errors or informalities in the mode of its formation existed, they were cured by the act of 1874, which not only declares that it was duly incorporated, but expressly clothes it with the power to execute the purposes for which it was created. The sovereign power was ample not only to waive defects in its organization, but also to endow it with the functions necessary to corporate life and action; it could dispense with, as well as prescribe, formalities to be observed. *Black River R. R.* v. *Barnard,* 31 *Barb.* 258; *White* v. *Coventry,* 29 *Ib.* 305.

This view, regarding the grant as clear and express, disposes of the further objections that a public work for the use of which tolls or fares are to be charged, cannot be constructed or business carried on over or underneath an inter-state river without clear legislative authority, and that the general railroad law does not authorize the making of a tunnel below the surface of the ground.

It is also insisted that the thirty-sixth section of the general railroad law exempts the land of the plaintiffs from sequestration.

The provision is, "that no corporation organized under this act shall be authorized to take, use or occupy by condemnation, any lands belonging to the State of New Jersey, or any franchise, lands or located route of any bridge, railroad, canal, turnpike or other corporation chartered for the purpose of facilitating transportation, except for the purpose of crossing said lands or route of said corporation, and except the lands of such other corporations not necessary for the purpose of their franchises; and provided further, that a railroad

may be located or constructed under this act on the surveyed route or location of any other railroad, with the consent of such corporation, and not otherwise."

If the tunnel company is not, by the special act of 1874, taken out of the control of the general law, this section has not the force claimed for it. Regarding this as an application to use the lands for the mere right of passage, for the purpose of crossing them by means of a tunnel, and, I think, in effect, it is nothing more, then it is not interdicted by the section cited. On the contrary, it is expressly excepted from the operation of that section by the words: "except for the purpose of crossing said lands."

"The condemnation of lands owned by one railroad company, not used for railroad purposes, by another company, for use in the construction of a railroad, will be unavailable to condemn the franchise of the former. All that will be acquired will be a right of way, and, incidentally, the power to cross the track of the former, when the routes of the two roads cross each other." *State, National Railway, pros.,* v. *Easton and Amboy R. R.,* 7 *Vroom* 181.

The strip of land, of the width and depth of the tunnel only to be taken by this proceeding, is merely that which is located from fifteen to thirty-five feet below the surface, under Fifteenth street, in Jersey City, between Provost street and Hudson river. The surface is to be supported in its present condition by the tunnel. The use of the surface will not be interrupted except where the working shaft is located, and that only during its construction. In fact, the right of passing over the lands is all that is taken; it is beneficial to the plaintiffs to have the crossing under the surface, and it can make no difference in legal effect, whether the tunnel company's road crosses at grade or in a cut, or through a tunnel. There is nothing in the law which forbids the right to condemn a passage under the surface. Any damage resulting to the value of the surface thereby will be estimated in awarding compensation. The plaintiffs will retain all the land above and below the tunnel.

Vol. ix.                    2 n

The right to pass through, under or upon lands is expressly recognized by section eleven of the general law.

But if this is treated as the taking of the lands of the plaintiffs, it is within a further exception to the prohibition of the thirty-sixth section, contained in these words: "And except the lands of such other corporation not necessary for the purposes of their franchises."

The evidence shows that the manner in which this land under Fifteenth street is to be taken by the tunnel company for the construction of their road, from fifteen to thirty-five feet under the surface, will not interfere with any necessary purposes to which the street could be devoted by the plaintiffs in the exercise of their franchises.

There is no railroad track now upon the surface of the street.

The construction contended for by the plaintiffs, that the lands of railroad companies are not within the latter exception, is not tenable.

The words, "such other corporations," refer to all the corporations before mentioned in that section.

The exceptions are designed—*First*. To permit one railroad in all cases to cross the lands of another—to authorize a mere passage; and, *Secondly*. To forbid any company organized under the act to take or occupy the lands of another company, which are necessary for the franchises of the latter, for any use except that of a way over, through or under them.

The proviso following the exceptions secures a company, after it has located and surveyed its route, from having its route and franchises appropriated, against its will, by any other corporation under color of this general law.

It could not have been the purpose of the legislature to enable existing corporations, by securing the available frontage in Jersey City, to erect an insurmountable barrier, which would obstruct the access of future roads to tide water at such points. There is nothing in the law to indicate that inten-

State, Morris and Essex R. R. Co., pros., v. Hudson Tunnel R. R. Co.

tion. The act should receive a liberal interpretation so as fairly to effectuate its general objects.

The remaining reason relied upon for reversal is, that the defendant has no right to condemn lands lying west of the line of solid filling, or to have commissioners appointed in a proceeding for that purpose.

It is argued that by the grant the westerly terminus of the road, as defined in the certificate, is at or to the eastward of the line of ordinary high water mark, which is east of Hudson street. The lands proposed to be condemned extend fourteen hundred feet west of that line. The tunnel, according to the certificate, is to commence "at some convenient and eligible point upon the western shore of the Hudson river, and within or near Jersey City or Hoboken."

The word "shore" is not used in its strictest sense, to mean the land between the limits of ordinary high and low water, but in the more extended and popular sense. In the latter signification of the word, Jersey City is built upon the westerly shore of the Hudson river, and the lands now sought to be crossed are on the western shore of the river.

This objection cannot prevail, it requires altogether too narrow an interpretation of the language in the certificate.

The result is that no error is found in the judgment below, and it should, therefore, be affirmed.

*For affirmance*—THE CHANCELLOR, DIXON, REED, SCUDDER, VAN SYCKEL, WOODHULL, CLEMENT, DODD, LILLY, WALES—10.

*For reversal* —None.